## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **AUTOMED TECHNOLOGIES,** | |
| **Plaintiff,** | |
| **v.** | **1:04-cv-1152-WSD** |
| **KNAPP LOGISTICS & AUTOMATION, INC., et al.,** | |
| **Defendants.** | |

## <u>ORDER</u>

This matter is before the Court for construction of claims in United States Reissued Patent No. RE37,829 (the "'829 Patent"). The claims to be constructed are described in Plaintiff AutoMed Technologies, Inc's ("AutoMed"), and Defendant Knapp Logistics & Automation, Inc.'s ("Knapp") Joint Claim Construction Statement [45] and the Supplement to Joint Claim Construction Statement [97] filed by AutoMed, Knapp and Defendant Knapp Logistik Automation GmbH ("Knapp Austria"). Each party has submitted memoranda supporting the interpretations of the claims they urge and contesting the interpretations offered by the opposing party. A <u>Markman</u> claims interpretation hearing was conducted on November 10, 2005.

## I. __BACKGROUND__

The '829 Patent concerns an automated system for filling medical prescriptions.  The system generally allows for a large number of prescriptions for oral, solid medications prescribed in different quantities to be filled by an automated system, thereby reducing the number of people required to be involved in the prescription-filling process.  Generally, the medications are each held in a bin.  Prescription information is inputted into a computer.  The computer inputs ultimately allow for medication to be deposited in the prescribed amounts into individual vials which are labeled with the prescription information, capped and collected for final disbursement to the person for whom the medication was prescribed.

The first patent for the subject system -- U.S. Patent No. 5,208,762 (the "'762 Patent") -- was issued on May 4, 1993, based on an application filed on December 6, 1990.  The '762 Patent contained fifteen claims.  A reissue application for the '762 Patent was filed on May 4, 1995.  It contained the fifteen claims in the '762 Patent and nineteen additional claims.  Knapp alleges the new claims were "repeatedly rejected, resulting in the PTO [(Patent and Trademark Office)] issuing a Final Rejection on October 1, 1998."  (Knapp's Opening Claim

Constr. Br. at 6.)  This application was abandoned by Automed.  Knapp claims that

after abandoning the reissue application, on January 15, 1999, the patentee filed the

Continuation Reissue Application.  Knapp claims that AutoMed acquired rights to

the Continuation Reissue Application and, on August 3, 1999, "submitted an

Amendment to the PTO in which it amended many of the claims, cancelled others,

added new claims, and argued against the outstanding rejections from the Final

Rejection of the Reissue Application" (the "Amended Submission").  (Knapp's

Opening Claim Constr. Br. at 6.)  In the Amended Submission,  AutoMed revised

independent Claim 26 to state, for the first time, that vials could be labeled before

or after filling.  (Id. at 6-7.)  The PTO, Knapp asserts, rejected amended Claim 26

and its dependent claims because they were based on new matter, noting

specifically that the original patent did not provide for labeling "before the filling"

step and that the claim provided only for labeling "during or after the filling

process."  (Id.)  Knapp alleges that AutoMed, in response, amended Claim 26 to

provide that "labeling occurs during or after filling."  (Id.)  Upon the filing of this

amendment, Knapp claims the PTO withdrew its new matter rejection.

    Knapp notes that in July 2001, AutoMed further amended Claims 1, 13, 16

and 22 in the Continuation Reissue Application to include a "labeling means" in

Claim 1, the phrase "the labeler apparatus positioned to receive the vial" in Claim 13 and the provision "the vial-labeler apparatus positioned with respect to the filling line" in Claims 16 and 22.  (Id. at 8.)  In making these changes, Knapp notes that AutoMed represented the changes were made to emphasize the machine structure of the apparatus and the "relationship of the structural components one to the other."  (Id.)  The PTO accepted these amendments.  Knapp thus argues these references show that AutoMed acknowledged position of the labeler is part of the means-plus-function structure providing further support that in amending its claims to state the labeler was under or after the vial filler it had disclaimed that the labeler could be upstream of the filler.

AutoMed argues that the prosecution history does not disclaim or disavow any of the claims or interpretations which it now urges, and otherwise disputes Knapp's and Knapp Austria's interpretation of the history and the basis for the claim amendments.

A.              <u>Disputed Claims</u>

The disputed claims fall into two basic categories.  The first are the "means" claims in Claim 1.  The second are the position of the labeler claims in Claims 13, 18 and 22.

1.      *"Means" claims*

AutoMed generally argues that the means claims in Claim 1 should be broadly and generically defined in relation to a system and should not be defined based on the description of the preferred embodiment in the claim, such as  specific machines identified in the specifications, as Knapp and Knapp Austria argue.

2.      *Labeler position claims*

AutoMed argues that the labeler position claims, including the labeler claim in Claim 1, do not provide for a particular position of the labeler and that labeling may occur before, at or after the vial filler.  Knapp argues that the labeler may appear only under or downstream of the filler.

**II.**   **DISCUSSION**

A.   General Interpretation Principles

1.   *Claim construction*

Claim construction is a matter of law for the Court.  Markman v. Westview

Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370

(1996).  In construing claims, a Court examines how a person of ordinary skill in

the art would have understood the claim terms at the time of the invention.  Pfizer,

Inc. v. Teva Pharm. USA, Inc., 429 F.3d 1364, 1372-73 (Fed. Cir. 2005).

> The inquiry into how a person of ordinary skill in the art
> understands a claim term provides an objective baseline
> from which to begin claim interpretation.  Importantly,
> the person of ordinary skill in the art is deemed to read
> the claim term not only in the context of the particular
> claim in which the disputed term appears, but in the
> context of the entire patent, including the specification.

Id. at 1373 (quotation and citation omitted).  The Court initially looks only at

intrinsic evidence, including the claims themselves, the specification, and the

prosecution history, if it is presented.  Phillips v. AWH Corp., 415 F.3d 1303,

1313-14 (Fed. Cir. 2005).  "[T]he claims are 'of primary importance[] in the effort

to ascertain precisely what it is that is patented.'"  Id. at 1312 (quoting Merrill v.

Yeomans, 94 U.S. 568, 570 (1876)).  "[I]t is unjust to the public, as well as an

evasion of the law, to construe [a claim] in a manner different from the plain import of its terms." Id. (quotation and citation omitted).  A court should turn to extrinsic evidence only when the intrinsic evidence is insufficient to establish the clear meaning of the asserted claim.  Zodiac Pool Care, Inc. v. Hoffinger Indus. Inc., 206 F.3d 1408, 1414 (Fed. Cir. 2000); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

"[W]ords of a claim 'are generally given their ordinary and customary meaning.'"  Phillips, 415 F.3d at 1312 (quoting Vitronics Corp., 90 F.3d at 1582).

> Ultimately, the interpretation to be given a term can only
> be determined and confirmed with a full understanding of
> what the inventors actually invented and intended to
> envelop with the claim.  The construction that stays true
> to the claim language and most naturally aligns with the
> patent's description of the invention will be, in the end,
> the correct construction.

Id. at 1316 (quotation and citation omitted).

> [C]laims of the patent in question, both asserted and
> unasserted, can also be valuable sources of enlightenment
> as to the meaning of a claim term.  Because claim terms
> are normally used consistently throughout the patent, the
> usage of a term in one claim can often illuminate the
> meaning of the same term in other claims.  Differences
> among claims can also be a useful guide in understanding
> the meaning of particular claim terms. . . .  [T]he
> presence of a dependent claim that adds a particular

limitation gives rise to a presumption that the limitation
in question is not present in the independent claim.

Id. at 1314-15 (citations omitted).

"[C]laims must be construed so as to be consistent with the specification, of
which they are a part." Merck & Co., Inc. v. Teva Pharm. USA, Inc., 347 F.3d
1367, 1370 (Fed. Cir. 2003). "It is necessary to consider the specification as a
whole, and to read all portions of this written description, if possible, in a manner
that renders the patent internally consistent." Pfizer, 429 F.3d at 1373 (quotation
and citation omitted). "[T]he specification 'is always highly relevant to the claim
construction analysis. Usually, it is dispositive; it is the single best guide to the
meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (citing Vitronics, 90 F.3d
at 1582).

The specification, viewed legally and practically, has the purpose to "teach
and enable those of skill in the art to make and use the invention and to provide a
best mode for doing so." Phillips, 415 F.3d at 1323. Phillips notes: "One of the
best ways to teach a person of ordinary skill in the art how to make and use the
invention is to provide an example of how to practice the invention in a particular
case." Id. When that is done, often "it will become clear whether the patentee is

setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Id.[1]  "A word or phrase used consistently throughout a claim should be interpreted consistently." Phonometrics, Inc. v. N. Telecom, Inc., 133 F.3d 1459, 1465 (Fed. Cir. 1998).

Assuming prior art does not disallow it, a patentee is allowed to draft claims that are broader than the specific embodiment set out in a specification. Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572, 1582 n.7 (Fed. Cir. 1996) (citing In re Vickers, 141 F.2d 522, 525 (C.C.P.A. 1944)).  An applicant may exclude a precise location as a claimed limitation of the claimed invention. Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 993 (Fed. Cir. 1999).

---

[1] It may be hard to determine if a person skilled in the art would

> understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature. . . . [A]ttempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claims language from the specification.

Phillips, 415 F.3d at 1323-1324.

### 2. *Prosecution history waiver*

Prosecution history may be especially useful to evaluate if a patent applicant in an application amendment or in prosecuting the application has disclaimed or disavowed a claim construction in an effort to have a claim approved.  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995); Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003).  In cases where a claim interpretation has been unequivocally disavowed so that a patent would be issued, "the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  Omega, 334 F.3d at 1324.  The doctrine of prosecution disclaimer does not apply "where the disavowal of claim scope is ambiguous."  Id. at 1325 ("[W]e have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.").  "[C]laim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources."  Johnson Worldwide, 175 F.3d at 989-90.  When the language of the claim is clear and uncontradicted, written descriptions, figures and prosecution history cannot be used to add limitations to the claim.  Liquid Dynamics Corp. v. Vaughan Co., Inc., 355 F.3d 1361, 1368 (Fed. Cir. 2004).

### 3. *Means-plus-function claim interpretation*

Where the claims at issue are in means-plus-function format and the claim does not recite any structure, 35 U.S.C. § 112, para. 6 (2005), necessarily applies. "Section 112, paragraph 6, allows a patentee to recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function." Omega, 334 F.3d at 1322. Section 112, paragraph 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, para. 6.

> The construction of a means-plus-function limitation follows a two-step approach. First, [identify] the claimed function, . . . staying true to the claim language and the limitations expressly recited by the claims. Once the functions performed by the claimed means are identified, [next] ascertain the corresponding structures in the written description that perform those functions. A disclosed structure is corresponding only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim. In other words, the structure must be necessary to perform the claimed function.

Omega, 334 F.3d at 1322 (quotation and citations omitted). "'When construing the

functional statement in a means-plus-function limitation, we must take great care not to impermissibly limit the function by adopting a function different from that explicitly recited in the claim.'" Id. at 1322 (quoting Generation II Orthotics, Inc. v. Med. Tech., Inc., 263 F.3d 1356, 1364-65 (Fed. Cir. 2001)).  Section 112, paragraph 6, does not allow "incorporation of structure from the written description beyond that necessary to perform the claimed function."  Micro Chem., Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999).  A structure is superfluous to claim construction analysis if it is "not required for performing the claimed function."  Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1334-35 (Fed. Cir. 2004); see also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998).

B.   The Disputed Claims

1.   *The means-plus-function claims*

The parties dispute the interpretation of six terms in Claim 1.  (AutoMed's and Knapp's Joint Claim Construction Statement ("Claims Constr. St.") [45], Ex. A at 1–7; Supplement to Joint Claim Construction Statement, Ex. A.)  Each of the disputed terms are means-plus-function claims.  The dispute between the parties generally focuses on the second step in the means-plus-function analysis in

which the Court must ascertain the corresponding structures in the written

description that perform those functions claimed.  The Court considers each

disputed term in turn.

<blockquote>
a. "vial filling means for filling at least one discrete vial with oral solid medication according to the prescription"
</blockquote>

The parties dispute the structure to which this function pertains.  AutoMed

argues for a generic structure described as "[o]ne or more vial fillers disposed in

series and/or in parallel, and equivalents thereof."  (Claims Constr. St. at 1.)

Knapp argues the structure is a  "'modified Automatic Tablet Control machine

manufactured by Sanyo Corporation in Japan and distributed by Baxter Health

Care Corporation, One Baxter Parkway, Deerfield, Ill. under the mark ATC' and

equivalents thereof."  (Id.)

AutoMed claims the structure corresponding to this means-plus-function

claim is described in three places in the specification.  First, in Figures 1 and 2 at

reference no. 26 and also at column 3, lines 44-55, which provide:

<blockquote>
From the unscrambler 20, a vial will travel via the conveyor 24 to the vial filler 26 (also referred to as the filler).  The vial filler 26 preferably comprises a modified Automatic Tablet Control machine manufactured by
</blockquote>

> Sanyo Corporation in Japan and distributed by Baxter
> Health Care Corporation, One Baxter Parkway,
> Deerfield, Ill. under the mark ATC.  This ATC machine
> or automatic tablet control, is capable of holding up to
> about 480 different oral, solid medications.  Such
> medications are held in canisters calibrated specifically
> for these drugs.  There can be one or more ATC
> machines per line depending on drug mix and drug
> volume required by the institution in which the system 10
> is installed.

(Claims Constr. St. at 1-2.)  Knapp claims the structure is the Sanyo manufactured

ATC machine described in the excerpt set out above.

AutoMed argues that reference to the Sanyo machine is "not usable [as a

defining structure] as it does not identify any specific structure corresponding to

the vial filling means and attempts to improperly limit" the claim to a specific

machine which has "structure" not necessary to perform the function at issue.

(AutoMed's Markman Br. at 6.)  AutoMed argues the structure should be defined

based on extrinsic evidence in the form of the inventor Mr. Keith Goodale's

testimony as to the minimum necessary structural elements of the Sanyo ATC that

are necessary to perform the vial filling function.  (Transcript of Markman Hearing

conducted on November 10, 2005 ("Tr.") at 60.)  Mr. Goodale testified:  "You

need a canister to hold the medication, a motor to dispense the medication out of

the canister, a funnel to accumulate it into the vial, and a PC board or some piece of hardware to interpret signals from the host computer or PLC to the canister." (Tr. at 60-61.)

The utility of Mr. Goodale's testimony is suspect here.  While one might argue that a person ordinarily skilled in the art might be aware of the minimum necessary elements in a Sanyo ATC machine, Mr. Goodale later testified that the Sanyo ATC machine generally available from the manufacturer at the time of the invention was not the same machine identified in the patent.  (Tr. at 69-70.)  He stated that he personally modified the Sanyo ATC machine to convert it from one which was used to put unit dosages of prescription medicine into sealed bags (not vials) for distribution within a hospital.  These packages contained labels with a variety of information such as the treating physician and the patient's room number.  (Id. at 69.)  Mr. Goodale changed this unidose machine by removing "all of that structure . . . for the unidose packaging, [including] the conveyors, the roll of paper, the transfer ribbon, things such as that," and replacing it with "a stainless steel funnel."  (Id. at 70.)  He acknowledged that Figure 1 in the patent does not represent the Sanyo ATC as he had modified it for the patented system.  (Id. at 71.) Indeed, he admits the vial filling machine depicted in Figure 1 is the unmodified

15

Sanyo ATC unidose machine and that the patent did not disclose what was required to modify the machine for it to be used in the patent system.  (Id. at 71-72).

Mr. Goodale's testimony at the Markman hearing fell short of stating that one ordinarily skilled in the art would have understood all the elements needed for the '829 Patent invention.  While he testified that one ordinarily skilled in the art would have understood the ATC machine had a canister to hold pills, a motor to dispense them and a PC board to run the motor and dispense the pills, he did not testify that one ordinarily skilled in the art would have known about the funnel.  (Tr. at 76.)  The funnel is the principal modification made to the ATC unidose machine to convert it to serve as the structure to perform the vial filling function of the patent.  Mr. Goodale acknowledges that the patent did not disclose how the Sanyo machine had to be modified.  (Id. at 71-72.)

It is logical that one ordinarily skilled in the art might know the general functional elements of an unmodified Sanyo ATC machine.  However, it is not similarly logical that one would know the functions of the ATC machine as *modified* by Mr. Goodale because the modifications are not described or explained anywhere in the '829 Patent.  That is, the structure AutoMed urges the Court to

16

adopt for the function in question here is not described in the patent specification. The absence of evidence that one skilled in the art would know all of the structure AutoMed alleges as the structure for the means-plus-function claim is significant and erodes significantly the credibility of the definition argued by AutoMed.  The Court notes further that AutoMed does not present any authority for its claim that a patentee may rely upon substructure in a commercially available machine described in a patent to satisfy the second requirement of a means-plus-function analysis -- that the specification adequately describes the structure that performs the function of the claim.[2]

In a means-plus-function claim, a patentee is required to identify in the patent specification a corresponding structure.  <u>Utah Med. Prods., Inc. v. Graphic Controls Corp.</u>, 350 F.3d 1376, 1384 (Fed. Cir. 2003) (noting patentee is "subject to the requirement that a claim 'particularly point out and distinctly claim' the

_____

[2]  AutoMed's argument that Mr. Goodale be allowed to describe the discrete subparts in the ATC that perform the vial filling function seems a dangerous precedent.  If allowed, it would permit a patentee to call an expert to describe structure that is not present in a figure or in a publicly available machine.  At its core, it is an invitation to allow AutoMed to import into the patent a structure description that simply is not present and where there is no evidence one ordinarily skilled in the art would know of such structure.  This sort of extrinsic evidence is the kind about which the Federal Circuit in <u>Phillips</u> was concerned  when it emphasized the need to focus on intrinsic, rather than extrinsic, evidence.

invention found in the second paragraph of section 112"; "[s]tructure disclosed in

the specification is 'corresponding' structure only if the specification or

prosecution history clearly links or associates that structure to the function recited

in the claim.  This duty to link or associate structure to function is the quid pro quo

for the convenience of employing § 112, ¶ 6.").

That is, in interpreting a means-plus-function claim the Court is required to

determine from the specification the structure that performs the function defined.

See Micro Chem., Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1258-59

(Fed. Cir. 1999) (noting court looks to written description to identify

corresponding structure).  Here, the structure required is one for "filling at least

one discrete vial with oral solid medication according to the prescription."  Knapp

argues the specific machine describes the structure.  AutoMed argues the structure

is a "vial filler,"[3]  described further only as "disposed in series and/or in parallel."

Neither description is a correct or complete construction.  The question is what is

there in the specification to "teach and enable those of skill in the art to make and

use the invention and to provide a best mode for doing so."  Phillips, 415 F.3d at

---

[3] If the structure in a means-plus-function claim can be defined by a
statement in the specification that simply repeats the function, Section 112,
paragraph 6, would become meaningless.

1323.

The Court has reviewed the patent closely and finds the filling structure is described in only one location -- column 3 at lines 44-61.  In these lines, which are part of the preferred embodiment, the filler structure is disclosed by reference to a specific machine and its cryptic description of the filler operation.

Besides the description of a specific machine, the specification describes the filler as having a canister to hold the drug, that the drug is dispensed into the vial from the canister and the drug dose is "counted into the vial until filling is complete."  The specification and the figures[4] disclose or show there can be one or more fillers per line or they may be placed in parallel lines.  Based on this information in the specification, the Court determines that the vial filler structure should not be limited to the modified ATC machine described in the specification because it is too limiting.  Rather, the structure disclosed for the filling function is at least one "filler which holds oral solid medication in a canister which has a mechanism to count and another to direct the medication into a vial, being in series

_____

[4]  The depictions in Figures 1 and 2 do not alone provide sufficient structure information.  At most, Figure 1 shows the outer appearance of a machine, not its function.  At the <u>Markman</u> hearing it was discovered that Figure 1 actually depicts a structure which cannot perform the function described in the claim.  Figure 2 provides no structure information at all.

and/or parallel, and equivalents thereof."[5]

        b.     "vial-transport means for automatically moving the vial about the filling, labeling and capping means and to a means for vial-receiving and sorting"

AutoMed argues the structure here be defined as "a conveyor system, and equivalents thereof."  Knapp argues it should be defined as "[s]tructure corresponding to the vial-transport means is a non-circulating, single direction conveyor, and equivalents thereof."  Essentially, Knapp argues the structure should be limited to one direction, and non-circulating.  Knapp relies on column 3, lines 7-67, column 4, lines 1-47 and Figures 1 and 2 at references 24a-c.

Nomos Corp. v. Brainlab USA, Inc., 357 F.3d 1364 (Fed. Cir. 2004), is instructive here.  In Nomos, the Court was required to identify the claimed function and corresponding structure in claim 1 of the patent at issue.  The parties agreed the function was "generating at least one ultrasound image of the lesion in the patient's body," but they disagreed on the structure.  Id. at 1367.  Brainlab argued that the specification contained a single embodiment which included a fixation

---

[5] The Court concludes one ordinarily skilled in the art would know that a counting mechanism would have to be part of the structure and that there would have to be structure to direct the medication into the vial.

device which fixed an ultrasound probe to the table on which the ultrasound test was conducted.  Brainlab relied on the only embodiment in the patent as the structure, and that structure called for the fixation device.  The Court in Nomos noted there was only one embodiment in the patent and further noted that it contained a fixation device.  The Court observed:  "we are careful to limit the corresponding structure to only that which is necessary to perform the recited function," but we are to "keep in mind that a means clause does not cover *every means* for performing the specified function."  Id. at 1368 (citation and quotation omitted).  In Nomos, because the patent expressly referred to a fixation device and the handheld ultrasound device manufactured by the alleged infringer did not use a fixation device, the Court found there was no infringement.

Knapp argues the definition of the structure for this means claim should include a non-circulating, single-direction conveyor.  However,  neither of these limitations are suggested in the patent language or figures.  There simply is no mention in the specification of the patent, including in the figures, that the transport means[6] is either non-circulating or single direction.  To include this language in the patent would impose a limitation that is not there.  Golight, Inc. v.

---

[6]  The parties both represent that the transport device is a conveyor.

Wal-Mart Stores, Inc., 355 F.3d 1327, 1330-31 (Fed. Cir. 2004) (finding it impermissible to read 360-degree limitation into claim at issue even though it is included in other independent claim because "limitations from the specification are not to be read into the claims").  Thus, defining this claim to include either non-circulating or single direction is inappropriate.

> c.   "means for vial-receiving and sorting; the receiving and sorting means receiving vials from said prescription filling line and automatically sorting said vials according to patient orders"

AutoMed argues the structure here should be defined as "an accumulation station, and equivalents thereof."  It relies on the "accumulation" station depicted in Figures 1 and 2 and the language of the specification, which provides:

> Once a vial has been capped and the contents are verified by the capper sensor 36, it proceeds to an accumulator or accumulation station 32 positioned at the end of its respective conveyor 24 (accumulator 32c is illustrated most clearly in Fig. 1).  The accumulation station 32 serves two functions:  sorting and ejecting Vials are ejected when they have an improper drug count, unreadable labels, or improperly seated caps.
>
> All properly bottled vials are assigned to a location on the accumulator 32 where they await a circulating bin 40 in which they are to be placed.  These locations are also referred to as the staging output area.  The accumulator

> 32 preferably has up to twenty locations for temporary
> vial storage.

(Claims Constr. St. at 5-6.)  Knapp argues the claim should be defined as an

"accumulation station that includes locations for temporary vial storage and a

pneumatic gripper on a rodless cylinder, and equivalents thereof."  (Knapp's

Opening Claim Constr. Br. at 22.)[7]  Knapp argues that because the specification in

the preferred embodiment described in the patent references a "pneumatic gripper

on a rodless cylinder," these components must be included in the definition

because the stations cannot sort without the gripper.  The Court disagrees.  For the

reasons stated previously, the Court is constrained from importing from the

specification limitations that are not necessary to perform the function described in

the means-plus-function claim.  While the Court agrees the gripper is described as

enabling sorting, a pneumatic gripper is not required to do so.  The Court does

agree that the definition requires more that just accumulation.  To perform the

function described, the structure must accumulate and sort, and thus the

construction here must include "sorting vials by patient prescriptions."  Without

_____

[7]  This definition is slightly modified from the definition Knapp asked the
Court to apply in the parties' Joint Claim Construction Statement.  The Court has
considered this later iteration of the definition.

this description, which is supported by the language of the specifications, this

structure would not perform the function described in the claim.

        d.      "means for automatically collecting
                    vials pertaining to one patient's order"

AutoMed urges the Court to define this structure as "a collection bin or bins

assigned to one patient's order, and equivalents thereof."  (Claims Constr. St. at 6.)

Knapp argues that the definition should be:  "[s]tructure corresponding to the

means is a 'circulating conveyor' and a number of bar-coded bins, and equivalents

thereof."  (Id.)  Essentially, Knapp contends AutoMed's definition must include a

"circulating conveyor" and a limitation that the bins be "bar coded."  The parties

rely on different parts of the collecting function specification in column 4 of the

patent.  The specification relating to this function, on which Knapp relies, reads as

follows:

> A circulating conveyor 42 (also referred to as a sorting
> conveyor) carries circulating bins 40 along a path that
> brings each of the bins under an accumulater 32 once per
> rotation.

('829 Patent, Col. 4, ll. 48-50.)  Neither party relies on the next portion of the

specification:

> The bins 40 are bar coded and the control system assigns

at least one circulating bin 40 per patient.  If a particular
patient has more vials than a single bin can hold, a
second or third bin will also be assigned.  A bin 40 will
circulate the conveyor 42 until a patient's total order has
been collected.  The bar code on the bin 40 will be read
by bar code reader 63 prior to travel under the
accumulators 32 and a signal will correctly time an
accumulator 32 to discharge a specific patient's vial into
the bin 40.

All properly bottled vials are assigned to a location on
the accumulator 32 where they await a circulating bin 40
in which they are to be placed.  These locations are also
referred to as the staging output area.  The accumulator
32 preferably has up to twenty locations for temporary
vial storage.

(Id., ll. 51-64.)

AutoMed relies on the following language from the specification:

The accumulators 32 are positioned above the conveyor
42 so that the vials awaiting on an accumulator can be
placed into a passing bin 40.  To this end, each
accumulator 32 has associated therewith a pneumatic
gripper 37 on a rodless cylinder for placing upon
command, a vial into an accumulator position.

One or more of the bins is assigned to a patient by the
control system.  As the assigned circulating bin(s) 40
move(s) under the vial accumulator 32, the accumulator
32 drops the vials into the assigned bin(s).  The drop of
the vials is effectuated by means of a released door
contained in the accumulator position on which the vials
rest and which is activated by a solenoid controlled by

25

>the control system.  Preferably, the accumulator 32 is
>capable of placing its entire contents in one bin, if
>necessary.  In this manner, all of the vials for one
>patient's order can be sorted and placed together in a bin.
>
>When a patient's total order has been accumulated in one
>or more bin(s) 40, the sorting conveyor 42 transfers
>bin(s) 40 to one of a plurality of spurs.

(Claims Constr. St. at 6-7; Col. 4, l. 65-Col. 5, l. 17.)

The function at issue here is the automatic collecting of vials for one patient.

AutoMed's definition of the structure to perform the described function is not

sufficient to perform the function, including that the function of collection here is

automatic.  The structure for this function begins to be described in column 4, line

48 of the '829 Patent specification.  The structure described operates to allow the

collecting of vials using a conveyor which carries the bins along a circulating path.

"[T]he vials awaiting on an accumulator can [because of the conveyor] be placed

into a passing bin."  (Claims Constr. St. at 6.)  As described in column 4, lines 48-

58, the structure is composed of a conveyor, which in this case is circulating so that

the function of collecting all of one patient's prescriptions can be accomplished as

required by the claim.  The remaining question is whether the bins must be bar

coded.  In the specification, the collection of prescriptions for a single patient, as

26

called for by the claim, is accomplished by a structure which has "bins 40 [which] are bar coded and the control system assigns at least one circulating bin 40 per patient. . . .  A bin 40 will circulate the conveyor 42 until a patient's total order has been collected."  (Col. 4, ll. 51-55.)  To fulfil the function in this means-plus-function claim the structure must contain that which facilitates the automatic collection process and only the bar-code is set out in the specification to meet that requirement.[8]

Ultimately, the disclosed structure in a patent must be capable of being compared with an allegedly infringing structure.  Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed. Cir. 1987).  Here, AutoMed described a structure for the corresponding function to include a circulating conveyor and bar codes.  These are stated in the specification throughout the collecting portion of the specification.  These elements are required to be included because they are necessary to perform the function described and are necessary for comparisons to the alleged infringing invention.

2. *The labeler claims*

---

[8]  That the bin collects all of a patient's prescriptions by the bins circulating on the conveyor provides further support that the structure must have a circulating conveyor.

        a.      "labeling means for placing a label including
information on the vial" (Claim 1);

        b.      "labeler apparatus positioned to
receive the vial" (Claim 13);

        c.      "vial-labeler apparatus positioned
with respect to the filling line"
(Claims 18, 22).

There are four disputed labeler claims.  One is the means-plus-function

claim in Claim 1.  For this claim, AutoMed submits that the corresponding

structure should be "a label machine, and equivalents thereof."  AutoMed relies on

Figures 1 and 2 and the language of the specification, which reads:

> After filling, the vial is labeled by a label machine 28
> (also referred to as the labeler), which an [sic] preferably
> be similar to Avery Model ALX 910 available from
> Avery Label Division, 35 McLachlan Drive, Rexdale,
> Ontario, Canada or a Willett Model 2600 manufactured
> by Willette America, Inc., 4901 Northeast Parkway, Fort
> Worth, Texas.  The labeler 28 can be located downstream
> of the vial filler 26 as shown or it can preferably be
> located under the vial filler 26 to label vials during or
> immediately following filling.  A signal from the control
> system is sent to the label machine 28 at the same time
> the vial is being filled.  The label machine print[s] human
> readable information on demand.  The label information
> is kept in a data base and contains drug description, as
> well as any warning statements.

('829 Patent, Col. 3, l. 62-Col. 4, l. 9.)  Knapp argues the structure is a "label

machine positioned 'under' or 'downstream of the vial filler' that is 'similar to the Avery Model ALX 910 . . . or a Willett Model 2600 . . . and equivalents thereof." The issue for Claims 13, 18 and 22 is the positioning of the labeler.  AutoMed submits that these terms should be defined as "a labeler apparatus positioned to operate on a vial to apply a label with information to the vial."  (Claims Constr. St. at 9.)  Knapp submits the claims should be defined as a "vial-labeler apparatus positioned downstream from or under the filler apparatus."  (Id.)  Essentially, AutoMed's definition does not limit the location of the labeler while Knapp's seeks to limit it to under or downstream of the vial filler.  Both parties discuss the prosecution file history on the issue of the labeler positioning.  AutoMed claims the history and AutoMed's responses to PTO concerns do not require the labeler to be positioned in any particular location.  Knapp believes the record and AutoMed's responses to the PTO show that AutoMed waived its claim that the labeler could be positioned upstream of the vial filler.  This positioning issue is common to the dispute over the definition of Claims 1, 13, 18 and 22, and will be discussed below.

The Court addresses first whether in Claim 1 the structure should include the two specific printers described in column 3, lines 62-67, of the '829 Patent.  Unlike

Knapp's argument with respect to the vial-filler claim, Knapp here urges only that the definition include that the label machine be "similar to" the Avery or Willett labelers identified in the specification.  The test is whether a person ordinarily skilled in the art would understand the structure necessary to perform the labeling function described in the claim, if the term "label machine" is used to describe the function.  That is, is the term "label machine" sufficient to describe the corresponding structure or is a further limitation, like those proposed by Knapp, required.  The Court agrees that "label machine" is sufficient and that a further limitation is not necessary to describe the structure necessary to perform the function described in the claim.[9]  Knapp's suggestion that the labeler be further described as one "similar" to the Avery or Willett models is unnecessary surplusage and an unwarranted limitation on the structure required.

The Court notes that AutoMed offers a somewhat more limiting description for the labeler by offering this definition for Claims 13, 18 and 22:  "a labeler apparatus positioned to operate on a vial to apply a label with information to the

_____

[9] The Court finds the additional description -- a labeler "to operate on a vial to apply a label with information to the vial" -- is not necessary to the construction of Claim 1.

vial."  (Claims Constr. St. at 7.)  Knapp simply refers to a "labeler apparatus" but with a further positioning limitation.  The AutoMed description of the labeler and what it does is most consistent with the specification and the other claims of the patent.

The more difficult question, which the parties agree applies equally to Claims 1, 13, 18 and 22, is whether the position of the labeler is limited to being under or downstream of the vial filler.  This argument centers on whether the position of the labeler is part of the "structure" of the claim, and whether the intrinsic evidence in the prosecution history teaches a labeler position or whether it shows that AutoMed waived upstream placement of the labeler during the claim prosecution process.  Resolution of these issues resolves the positioning issue for all four claims.

In referring to the specification of the claims, AutoMed notes the specific provisions which discuss the location of the labeler.  These include:

1.     Figures 1 and 2 which both place the labeler downstream of the filler.

2.     The language in column 3, line 67 through column 4, line 3, which provides:  "The labeler 28 can be located downstream of the vial filler 26 as shown or it can preferably be

located under the vial filler 26 to label vials
during or immediately following filling."

3.      "Claim 5 (specifically reciting that the
labeler is 'positioned . . . downstream
of said filler')."

4.      "Claim 25 (placing a label step occurs
'during or after the filling step')."

5.      "Claim 31 (automatic filling and
labeling can occur 'in no particular
order')."

(Claim Constr. St. at 8.)  Knapp similarly cites specification references stating that

the labeler is at or after the filler.  The question is whether these specification

references which, but for one, describe the labeler as being under or downstream of

the filler, or the prosecution history, disallow labeler placement upstream of the

filler.

a.      Claim 1 position argument

AutoMed argues that the only structure necessary to perform the function in

this means-plus-function claim is the "labeler."  It argues that the language of the

specification stating the labeler "can be located downstream of the vial filler 26 as

shown or it can preferably be located under the vial filler 26 to label vials during or

immediately following the filling" is surplusage and not a part of the structure.

32

(AutoMed's Markman Br. at 10.)  Knapp acknowledges that the positioning of the

labeling means is not structure.  (Knapp's Resp. to Automed's Markman Br. at 19.)

It argues, however, that the claims on their face describe the function by referring

to the position of the labeler.  If position is a defining part of the claims, and

tenants of interpretation require the Court first to focus on this claim language, to

ignore the reference to the "position" of the labeler would be to change the terms

and limitations selected by the patentee.  Because positioning is (i) material, (ii)

specifically referenced by the patentee in the patent when discussing structure, and

(iii) discussed in multiple places, Knapp argues the position is part of the structure

and the multiple position references "should be construed 'in a manner that renders

the patent internally consistent.'" (Id. (quoting Frank's Casing Crew & Rental

Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1377 (Fed. Cir. 2004).)

Thus, the Court initially must consider Claims 13, 18 and 22 and the specification

to determine if positioning limits those claims.[10]  If label position is not necessary

in constructing these claims, there is no internal consistency issue.

>           b.      Claim 13 ("labeler apparatus
>                   positioned to receive the vial");

---

[10]  If positioning is not a limitation in Claims 13, 18 and 22, it would not be
internally consistent to impose positioning limitations in construing Claim 1.

Claims 18 and 22 (vial-labeler
apparatus positioned with respect to
the filling line")

AutoMed and Knapp propose different constructions for these claims

although they each propose essentially the same construction for all three claims.

AutoMed proposes:  "a labeler apparatus positioned to operate on a vial to apply a

label with information to the vial."  (Claims Constr. St. at 7, 9.)  Knapp proposes:

"labeler apparatus positioned downstream from or under the filler apparatus."

(Id.)[11]

AutoMed focuses its argument on Claim 13.  AutoMed first argues that

imposing a position element in this claim violates the principle that claim terms are

to be given their ordinary and customary meaning except where the patentee

becomes his own lexicographer or a claim term is unclear.  See Johnson, 175 F.3d

at 990.  AutoMed claims further that a claim term may not be narrowed by

referring to the written description in the patent or the patent prosecution history.

See id.; see also Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1204

---

[11]  For Claims 18 and 22 Knapp uses "vial-labeler apparatus," the phase used
in the claim itself.  This is, in the Court's view, the preferred term although it is
unlikely to affect the interpretation of the claim because it is not materially
different from "labeler."

(Fed. Cir. 2002).  AutoMed argues that Claim 13 by its terms does not include a

position limitation.  While acknowledging there are positioning limitations in the

specification, AutoMed argues such limitations may not be imported into the

claim.  (Automed's Markman Br. at 18.)  AutoMed next argues that despite the

positioning representations in the specification and Figures 1 and 2, positioning is

not an essential element of the invention and thus the claim should be read broadly

even if the reading is broader than the specific embodiment disclosed in the

specification.  See Ethicon, 93 F.3d at 1582 n.7; Gentry Gallery, Inc. v. Berkline

Corp., 134 F.3d 1473, 1479 (Fed. Cir. 1998).[12]  In AutoMed's view, the positioning

representations in the specification are permissive rather than mandatory.[13]

_____

[12]  AutoMed's reliance on Gentry Gallery is misplaced.  In Gentry Gallery,
the Court found location was central to interpretation and application of this claim,
stating:  "[T]he original disclosure clearly identifies the console as the only
possible location for the controls. . . .  [A]nother object of the present invention is
to provide a console positioned between the reclining seats that accommodates the
controls for both of the reclining seats."  Gentry Gallery, 149 F.3d at 1479
(quotations omitted).

[13]  AutoMed also cites to method Claim 31 to support its claim construction
that the labeler may be positioned anywhere.  Its reliance on this argument is
misplaced.  Claim 31 relates to signals from the control system and states in part:
"providing at least one command from the control system to the automated
apparatus for filling and labeling whereby the at least one discrete vial is, in no
particular order, automatically filled with medication. . . ."  Furthermore, Claim 31
consistently lists filling before labeling.  The claim text can be consistently

The Court concludes, considering only the intrinsic evidence, that positioning of the components of the invention necessarily is part of the invention.[14]  The language of the patent itself unequivocally describes the position of the labeler and the patent was amended specifically to refer to the positioning of the labeler.  That limitation is stated early in the patent.  After providing five paragraphs of information on the "Background of the Invention" generally discussing its commercial use, the patentee provides a "Summary of the Invention" and discusses specifically how it appears in an embodiment.  That is, the patent describes the invention for the public, including those skilled in the art.  In doing so, the system is described:

> The system processes the information and automatically fills one or more vials with one or more drugs, and *then* automatically labels and caps the vials containing drugs . . . .

('829 Patent, col. 1, ll. 55-58 (emphasis added).)  A few lines later, it again refers

interpreted, with these other claims and specifications requiring labeling after filling, by interpreting this text to refer to that situation when the labeler is under the filler, in which case whether filling or labeling occurs simultaneously or one technically occurs first is immaterial.

[14]  The invention will not operate unless various parts of the system are placed in a particular position in relation to other parts.  For example, the capper cannot be positioned before the filler.

36

to "at least one line of machines that will automatically fill, label, cap, and sort vials . . . ." (Id., ll. 64-66.)  These clear and unequivocal statements of the label function occurring after filling, indicates the labeler structure must either be under the vial filler or after it within the system.

The specification explicitly provides that filling occurs prior to or concurrently with labeling.  Column 3, lines 62-63, provide:  "*After* filling, the vial is labeled by a label machine . . . ."  The specification further provides:  "The labels 28 can be located *downstream* of the vial filler 26 as shown *or* it can preferably be located *under* the vial filler 26 *to label vials during or immediately following filling*."  (Col. 3, l. 67-Col. 4, ll. 1-3 (emphasis added).)

This specification language is consistent with the other intrinsic evidence, specifically the prosecution history.  Knapp notes the patent itself limits the position of the labeler to under or after the filler and that this prescribed positioning necessarily follows from the Patent Office's rejection of Claim 26 which AutoMed proposed during the reexamination and which allowed for the labeler to be located before the filler.  The before-filler positioning was rejected by the examiner because it constituted new matter from the original patent, which did not provide for the labeler to be upstream of the vial filler.  AutoMed responds that

37

the examiner ultimately withdrew the new matter objection to Caim 26, that it did

not argue to the examiner in seeking allowance of the claims anything with respect

to the labeler positioning, and thus there was no "clear and unmistakable waiver"

as required by law.  See Omega, 334 F.3d at 1334.  Even if there was a waiver,

AutoMed argues the waiver is limited, at most, to Claim 26.

On January 15, 1999, AutoMed filed its amendment to the patent that

ultimately was reissued as the '829 Patent.  On August 3, 1999, AutoMed amended

Claim 26 to provide:  "automatically filling the discrete vials in the filling line with

prescribed drugs corresponding to the patient's order based on at least one

command from the control system."  This language was followed by this specific

amendment:  "*before or after the filling step*, automatically *labeling* the vials . . . ."

(See Aug. 3, 1999 Amendment, attached as Ex. 4 to Knapp's Opening Claim

Constr. Br., at 4-5.)  The italicized language was language by which AutoMed

sought to amend its claim.  On August 30, 2000, the PTO responded to AutoMed's

proposed amendments.  (Aug. 30. 2000 Office Action, attached as Ex. 6 to

Knapp's Opening Claim Constr. Br., at 5.)  In its response, the PTO stated in

paragraph 12:

Claims 26, 28-31, and 35 are rejected under 35 U.S.C.

> 251 as being based upon new matter added to the patent
> for which reissue is sought.  The added material which is
> not supported by the prior patent is as follows:
>
> in claim 26, line 12, the limitation of
> labeling the vial before the filling step is not supported
> by the original disclosure.  In the disclosure, on the page
> starting with col. 4, lines 1-3, only disclose that the
> labeling can occur during or after the filling process not
> before the filling process as is now being claimed.

(Id.)  This rejection, at least as it pertains to Claim 26 on the issue of labeler

position, is unambiguous.  In response to the PTO's August 30, 2000

communication, on November 30, 2000, AutoMed filed with the PTO its

Amendment to the application for patent reissuance.  (Nov. 30, 2000 Amendment,

attached as Ex. 7 to Knapp's Opening Claim Constr. Br., at 16.)  AutoMed

provided the following explanation regarding its amendments in response to the

comments made by the PTO on August 30, 2000:

> Claim 26 (and, accordingly, its dependent claims 28-31
> and 35) was amended to recite that the labeling occurs
> during or after filling as noted by the Examiner in
> paragraph 12 of the Office Action.  Since the language of
> amended claim 26 is as suggested by the Examiner, it is
> requested that the rejection of these claims under 35
> U.S.C. § 251 be withdrawn.

(Id.)  This series of communications shows:  (1) the PTO rejected Claim 26

because it included new matter not present in the original patents -- specifically, that the labeler could be located before the filler; (2) in response to the rejection AutoMed revised Claim 26 and Claims 28-31 and 35 to remove any reference to the labeler being before the filler, making it clear that the labeling function occurs "*during or after filling*"; and (3) because this change in labeler position was made, AutoMed asked that the rejection of the claim be withdrawn.  Consistent with the elimination of the "before filling language" and AutoMed's commitment to an "at or after the filler" labeler function, AutoMed thereafter consistently referred to the order of processes in the system as labeling occurring at or after filling -- never before it.  The withdrawal of the "before filler" references in these various claims indicates the withdrawal was comprehensive, not isolated to one claim.

That the labeling function was to be performed after filling is supported by the final language of Claim 13 where the "labeler apparatus is positioned to receive *the* vial" rather than "*a*" vial.  The claim begins with "*a*" vial being filled, "labeling *said* [filled] vial, and capping *said* vial."  Thus, embedded in Claim 13 itself is that a vial is filled, after which "*said*" vial is labeled.  ('826 Patent, Col. 15, ll. 64-66.)[15]

---

[15]  The parties agree that the position limitation proposed should be constructed identically for Claims 13, 18 and 22.  (Knapp Opening Claim Constr. Br. at 11; AutoMed Opening Br. at 25.)

This interpretation of the claim is consistent with the description of the invention in the Summary of the Invention section and the specifications.

The heavy presumption is that a claim takes on the ordinary and customary meaning of the words used to describe it.  Johnson Worldwide, 175 F.3d at 989. The plain and ordinary meaning of the words in the claims and specifications is that the labeling function and structure is either under or after the vial filler.[16]

AutoMed relies significantly on Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), for the analytical framework it urges the Court to apply here.  While AutoMed urges Texas Digital be read for the proposition that the Court must not deviate from the express language of the claim, a careful reading shows AutoMed's interpretation of the holding in Texas Digital is too general and simplistic.  Texas Digital states the general proposition that the words of a claim generally are given their ordinary and customary meaning.  But the Court in Texas Digital went further, stating:

> [T]he intrinsic record also must be examined in every
> case to determine whether the presumption of ordinary
> and customary meaning is rebutted.  Indeed, the intrinsic
> record may show that the specification uses the words in
> a manner clearly inconsistent with the ordinary meaning

[16] Both Figures 1 and 2 also show the labeler after the vial filler.

41

> reflected, for example, in a dictionary definition . . . .
> Further, the presumption also will be rebutted if the
> inventor has disavowed or disclaimed scope of coverage,
> by using words or expressions of manifest exclusion or
> restriction, representing a clear disavowal of claim scope.

Id. at 1204.

The Court here is inclined to explore other intrinsic evidence and the

prosecution history.  When the Court does that in this case, it finds that the system

which is being patented here consists of a series of operations, that AutoMed

revised its patent so that it would be approved by eliminating references in

Claim 26 and others dependent on it to before-filling labeling, and AutoMed

consistently referred to the process and the relationship of the structures within the

system to ensure the labeling function was not stated to occur before the filling

function.  Using the intrinsic evidence to interpret the claims presents compelling

evidence the invention anticipates a labeler under or downstream of, and not

before, the vial filler.

Prosecution history also is useful to evaluate if a patent applicant in an

application amendment or in prosecuting the application has disclaimed a claim

construction in an effort to have a claim approved.  Southwall Techs., Inc., 54 F.3d

at 1576; Omega, 334 F.3d at 1324.  In cases where a claim has been unequivocally

disavowed for a patent to be issued, "the doctrine of prosecution disclaimer

attaches and narrows the ordinary meaning of the claim congruent with the scope

of the surrender."  Omega, 334 F.3d at 1324.  The doctrine of prosecution

disclaimer does not apply where the disavowal of claim scope is ambiguous.  Id. at

1324-1325 ("[W]e have thus consistently rejected prosecution statements too

vague or ambiguous to qualify as a disavowal of claim scope.").  The prosecution

history in this patent is interesting.  While the language of Claim 13 by its terms

discloses that labeling occurs after or at filling, even if it did not, this is a case in

which the prosecution history provides strong evidence that AutoMed waived

positioning the labeler before the filler for the patent to be approved.  The history

shows the PTO would not allow for a pre-filler labeler.  In the face of this stated

position, AutoMed revised its claims and provided for a labeler that was under or

downstream of the filler.  This positioning thus is required to be included in the

construction of Claims 1, 13, 18 and 22.

     C.     The Supplemental Disputed Claim

On June 24, 2005, AutoMed, Knapp and Knapp Austria filed a Supplement

to Joint Claim Construction Statement ("Claim Constr. St. Suppl.") [97].  In the

supplement, the parties seek construction of an additional means-plus-function claim in Claim 1.  The claim is:  "means for assigning one of said prescriptions to at least one prescription filling line for processing."  The parties agree that the definition should include a computer (AutoMed requests the term be "computer/processor"), but disagree as to further limitations on the definition. AutoMed contends the structure should be defined as a "computer/processor programmed to maintain a list of prescriptions for processing by at least one prescription filling line."  (Claim Constr. St. Suppl.)  In support of its construction, AutoMed relies on four patent specifications and Figure 4.[17]

---

[17]  The specifications on which AutoMed relies are:

> "for accomplishing the foregoing consists of at least one line" Col. 1, l. 64;

> "invention encompasses any number of lines.  Preferably, the lines are identical with the exception of the vial sizes filled" Col. 3., ll. 13-14;

> "dedicated Prescription Wait List.  When such a determination is made, a prescription in a patient's order is placed at the tail end of the appropriate Prescription Wait List.  Prescriptions are removed from a Prescription Wait List in the order received" Col. 6, ll. 30-34;

> "The Prescription Fill Lists 114 are used when vials are to be filled. One Prescription Fill List 114 is produced for each filler 26.  When an accumulator area becomes available" Col. 6, ll. 53-55;

Knapp and Knapp Austria contend the interpretation is:  "Structure corresponding to the 'means for assigning' is a computer programmed to perform the algorithm of Figure 8 of the '829 Patent."  (Claim Constr. St. Supp.)  In support of their interpretation, Knapp and Knapp Austria rely on column 8, lines 15-37, which describe the process illustrated in Figure 8 which sets out the prescription assignment process for assignment to the optimal filling line.

The function at issue is the assignment of "one of said prescriptions to at least one prescription filling line for processing."  (Claim Constr. St. Supp.).  The supports cited by AutoMed, Knapp and Knapp Austria envision a system with one or more filling lines.  The AutoMed support further provides for multiple lines involved that would be identical except for the vial size filled by the line.  ('829 Patent, Col. 3, ll. 13-14.)  Reading the cited support carefully, the structure for the function described requires a computer or controller which may perform the function of initial assignment to a filling line.  The definition proposed by

_____

"The patient fill process is the process by which a patient's order is divided into its various prescriptions which are then assigned to the various lines" Col. 7, ll. 56-58; and

Figure 4 is described as "a prescription fill flow diagram for the system of Fig. 1" Col. 2, ll. 29-30.

AutoMed focuses on the maintenance of the list of prescriptions and addresses the need to assign the prescription to be filled to the appropriate filling line.  However, it does not describe a structure when more than one filling line is involved.  For example, where there is more than one filling line with each line having different size vials, and the prescription to be filled cannot be filled successfully by the line with the smaller vials, the structure needed to perform the function required must initially identify the line which can perform the filling function.  The question is where in the specification that structure is described.  Knapp argues that the proper structure to perform the complete function is the structure described in the algorithm of Figure 8.  Figure 8 sets forth not only the line assignment function, but also requires assignment to that line which performs the filling function optimally.  Knapp and Knapp Austria rely on WMS Gaming Inc. v. International Game Technology, 184 F.3d 1339 (Fed. Cir. 1999), for the proposition that the algorithm must be adopted as the proper corresponding structure here.  In WMS the Court considered a "means for assigning" claim.  The claim at issue was as follows:

> means for assigning a plurality of numbers representing
> said angular positions of said reel, said plurality of
> numbers exceeding said pre-determination number of

46

> radial positions such that some rotational positions are
> represented by a plurality of numbers

Id. at 1346.  In WMS, the parties agreed that the structure for the claim included a

"microprocessor or computer."  Id. at 1347.  The written description in the patent

at issue in WMS was, like here, "almost completely devoid of any structure to

support th[e] limitation of the claim."  Id. at 1348.  Rather than limit the structure

to the algorithm disclosed in the patent, the Court noted that the lower court had

instead interpreted this "lack of disclosure to indicate that the limitation reads on

any means for performing the recited function."  Id. at 1348.  In holding this

interpretation as error, the Court stated:

> In a means-plus-function claim in which the disclosed
> structure is a computer, or microprocessor, programmed
> to carry out an algorithm, the disclosed structure is not
> the general purpose computer, but rather the special
> purpose computer programmed to perform the disclosed
> algorithm.

Id. at 1349.  Thus, the Court held the structure was a computer programmed to

perform the functions of the claim at issue.  Id.; see also Tehrani v. Hamilton Med.,

Inc., 331 F.3d 1355, 1361-62 (Fed. Cir. 2003).

AutoMed, Knapp and Knapp Austria agree that the structure discloses a

computer or processor.  The question is whether there should be imposed a further

47

limitation that the computer or processor is one programmed to perform the Figure 8 algorithms.  The Court finds that <u>WMS</u> teaches that the computer must further be described as one which is programmed to perform the functions described in the claim.  The '869 Patent describes in the preferred embodiment functions specifically to be performed.  Thus, the "disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." <u>Id.</u> at 1349.  In this case the assignment function includes initial assignment to a line and a variety of functions once a vial is assigned to a line for filling.[18]  Thus, the computer must be one which is programmed to assign vials to a line initially, including the assignment when more than one line is involved.  The only provision of the specification which addresses a multiline assignment function is that identified by Knapp and Knapp Austria which includes a computer programmed to perform the Figure 8 algorithm.  The Court finds that Knapp and Knapp Austria's proposed construction of the claim describes the structure disclosed and further finds that AutoMed's proposed construction is too general.

-----

[18]  The Summary of the Invention provides that the computer input thereafter directs the function of the system from vial size selection to collection for a specific patient.

## III.   <u>CONCLUSION</u>

Accordingly, and for the reasons stated above,

**IT IS HEREBY ORDERED** that the disputed claims shall be constructed

in the litigation as follows:

| Claim | Limitation | Construction |
|-------|-----------|-------------|
| 1 | "vial filling means for filling at least one discrete vial with oral solid medication according to the prescription | at least one filler which holds oral solid medication in a canister which has a mechanism to count and another to direct the medication into a vial, being in series and/or parallel, and equivalents thereof |
| 1 | "vial-transport means for automatically moving the vial about the filling, labeling and capping means and to a means for vial-receiving and sorting" | a conveyor and equivalents thereof |
| 1 | "means for vial-receiving and sorting; the receiving and sorting means receiving vials from said prescription filling line and automatically sorting said vials according to patient orders" | an accumulation station which sorts vials according to patient orders, and equivalents thereof |
| 1 | "means for automatically collecting vials pertaining to one patient's order" | a circulating conveyor and bar-coded bins for collecting vials, and equivalents thereof |

| 1 | "labeling means for placing a label including information on the vial" | labeler positioned under or after the vial filler |
| 13 | "labeler apparatus positioned to receive the vial" | labeler positioned under or after the vial filler |
| 18, 22 | "vial-labeler apparatus positioned with respect to the filling line" | labeler positioned under or after the vial filler |
| 1 | "means for assigning one of said prescriptions to at least one prescription filling line for processing" | computer/processor programmed to perform the algorithm described in Figure 8 of the patent |

**SO ORDERED** this 6th day of June, 2006.

_____

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE